Good morning, Your Honor. This is Jeff LeBeau on behalf of Pellant. If I could reserve five minutes for rebuttal. Your Honor, in this case, the district court had to ignore conflicting evidence in order to grant the Rule 50 motion. Well, now, that's why the district court denied summary judgment because there was a declaration from, I believe it was someone named Self, who was the sister of the deceased, is that correct? That's correct. However, during the trial, and that was the sole reason for denying the summary judgment. At the trial, Self said, I didn't even look at that before I signed it. So, probably, if that had been ascertained at the summary judgment stage, then if someone signs an affidavit that they haven't even looked at, and that was the sole reason for denying the summary judgment, it never would have even gone to trial. So, why isn't this right here? Well, and that was a significant problem at the trial, but it was mostly a problem of confusion. And this is the reason why. The appellant's co-counsel, in this case, had a long discussion with April Self over the telephone with her father and wrote up the declaration during that telephone conversation and then faxed the declaration over. Unbeknownst to counsel, the father just simply presented the declaration to the daughter, April Self, who then signed it. But the salient point was, at trial, her testimony, her trial testimony, which wasn't based on direct examination, was not based on the declaration. It was just simply elicited testimony regarding her observations and memory, did not conflict in any significant way with the declaration that had been provided for the summary judgment motion. And, in fact, the issue came up because counsel was going to ask her a couple questions about the declaration, and that's when she said that she really didn't know what was in the declaration. Well, let me ask you this. If, obviously, at the stage where this was after the evidence was concluded and the court, so it didn't go to the jury and the court said that if there was evidence that Rodney lunged at the officer, would that justify, if it was undisputed that Rodney lunged at the officer, would that be sufficient to justify the shooting? If it was undisputed, there was no other evidence that he did anything else other than lunge at the officer volitionally. All right. So what evidence is there, can you point me to, on the record, that he did not lunge? April Self testified that, and this was the distinction in her declaration versus her trial testimony. In her trial testimony, she testified that she saw her brother standing at the back of the kitchen, which is the extreme end of the mobile home, away from the officers, and could see from his shoulders down and saw him go down at the time that the shots were fired, indicating that he was not lunging or charging towards the officers. The other thing is that the officers indicated, and this was the distinction that the court had a little problem with, is that there was a reference in the declaration that he did not have his hands and arms raised above his head with a knife in his hand as one of the officers, because each one of the officers had a different version of what he was doing at the time of the shooting, but one of the officers said he had his hand raised above his head with the knife. April Self said that he did not have his arms raised above his head. But even her trial testimony, wherein she said she couldn't see his hands and his arms, she said she could see his shoulders standing in the back of the kitchen. Clearly, if she could see his shoulders, she would have been able to see his hands and arms, if in fact they were raised above his head. And what did her declaration say? Her declaration said that he did not have his hand raised above his head in the back of the kitchen at the time that he was shot, that he was fired upon. He wasn't holding a knife above his head. So the point being is that there was some minor discrepancies between her declaration and her trial testimony, but the basic contention, which is that he was not lunging, was not charging, did not have his arm raised above his head, was in fact verified through her testimony at trial. It wasn't, as counsel has implied, it wasn't a recantation, a renunciation of the declaration that had been submitted. There was a small variation, but it still held the same evidentiary weight as the declaration that had been submitted for the purposes of the summary judgment motion. Okay. But, you know, the case comes down to a situation of, you know, what is the appropriate thing for an officer to do when confronted with somebody who is suicidal and mentally ill? These officers testified. Why does it come down to that, if your theory is they just shot him when he was standing there doing nothing aggressive, and he was standing miles away from them, well, eight feet maybe, away from them, and they just decided to shoot him down? Well, you're right. That doesn't sound very logical, but let's say that's what you're saying to us. They just shot him down for no reason while he was standing there. They just got sick of dealing with this guy after six minutes and decided, well, we'll just finish cutting him down. Well, I actually think there was an element of frustration and being tired, but I'm not saying the officers just decided to open fire on him. Well, that's what you just said, that he wasn't moving towards them, he wasn't doing anything, he was standing there. They taser him for the sixth time, and he's just standing there, and they decide, well, we're just going to shoot this guy down. They say, of course, they were scared to death, but never mind. That's what you said a moment ago. That's what happened, according to your evidence. What I said is that there is evidence, there is conflicting evidence, from one of the witnesses that the judge had to ignore in order to grant the Rule 50 motion. Well, you're saying it was believable evidence, or else we're just here playing games, right? You're saying the jury could have easily found he was just standing in the back there, they tase him a sixth time, and he doesn't do anything. They thought, oh, well, the sixth time didn't work, we're going to gun him down. That's about what the scenario that she, you say, would support, correct? She would support the fact that he was not lunging at the officers at the time that they fired upon him. Lunge is an interesting word. He wasn't moving toward them. He didn't have his knife at the ready, below where she could see. None of those things, right? Now, they say, of course, something very different, but that's neither here nor there at this moment. So that's it, right? That's what we take a jury could find, that he was just doing nothing. He was just there being tased and shot, correct? Well, there's more evidence that bears on those specific issues. He had been moving back and forth the entire time. And at the time that he was shot, he was no further forward than he had been previously when he had moved forward and moved back and had not been shot. The other thing is that at the time that he was shot, he had been tasered. There's testimony that they opened fire on him at the same time that Officer Sallery had begun to taser him. So there is evidence that tasering can cause non-volitional movements, that you can suffer paralysis, you can suffer dizziness. It can completely change the way your body moves. I fail to see how that has anything to do with the issue here. Where the Autists are facing a guy who's been tased and who is non-volitionally coming toward them with a knife in his hand, they think and saying, why don't you shoot me? Can't you guys finally shoot me or something? Not those words. So he's coming at them with a knife in his hand. They're concerned in this pretty small space that if he gets any closer, one of us is going to have a knife stuck in him and may be killed. So they say. The fact that really it's tasered that caused him to move forward, and he didn't really mean that. He's acting unvolitionally, but he can still hold on to a knife and come toward them. I understand what you're saying, but that has to be the theory, right? But that also goes against what Self supposedly said, that he didn't move at all. He just stood there. Which goes back to the fact that there is conflicting evidence, but also raises an extremely important point, which is this. The officers, when they arrived at this suicide call and the evidence. Well, okay, it's undisputed that the mother calls and also that the decedent himself called and said that there had been a suicide, right? That's right. So that's undisputed. It's undisputed that they don't go to guns right away. They go to tasers and that the deceased is pulling the darts out of himself and not submitting. It's undisputed that it's about six minutes, right? Well, this is the critical issue. When they arrive, they arrive there under the belief that this is a suicide call. They get information. They don't know exactly what's happening because they know that there's something going on. There's a conflict going on. When they go in the motorhome, this is what they find out. That Rodney is standing at the back of the kitchen. Is it a mobile home? I'm sorry, mobile home. That Rodney is standing at the back of the kitchen with a knife, a small steak knife in his hand. They ask his stepfather who's standing across from him to exit the mobile home. Rodney does nothing to stop him. Does nothing assaultive in any way. They ask the daughter to come out. And the only words that are spoken in those first 30 seconds before the officers tase him is, shoot me, I'll stab myself, and that's it. Now, even Officer Galassi testified that once he came in that motorhome and heard what Rodney was saying, he knew in his mind that this was a suicide situation. Now, there is an entire domain training dealing specifically with mental illness and suicide, and the protocols that are required for that domain are nearly 180 degrees different than the way you treat somebody who is a violent criminal. Are you saying, though, that an officer must accept the fact that if someone has a deadly weapon and they've indicated they want to commit suicide, that the officer therefore has to say that knife is not dangerous towards him or her? No, that's not what I'm saying. Well, but you're saying they have to go to a completely different protocol than worrying about their safety. They have to be concerned about preventing someone from committing suicide, and I don't think that there's anything to support that position. I think when someone has a knife, you've got to be concerned that they have a knife, and to the extent that the knife, obviously we don't want anyone to commit suicide, but suicides turn into homicides, too. A knife can be used as a suicide or a homicide weapon. I don't believe that being concerned for one's safety and implementing proper suicide prevention tactics and techniques are exclusive to one another. But the question seemed to be, we were talking about a shooting a while ago, and now we're talking about tasering, I understand. As you indicated in the instruction you submitted to the court, if the officers did shoot him otherwise properly, they didn't commit a civil rights violation unless they did a provocation that was an independent constitutional violation. So now we're not talking about shooting anymore, we're talking about tasering. And your argument is, I understand, that it was an independent constitutional violation to taser this guy. Within 30 seconds of entering, when he was... Within 30, within 60, within six minutes, it was unconstitutional to use a taser on him. That's your argument, if I understand it. That's correct. All right. And that there was no warning given, no derailed warning given, that he was standing at that point 12 feet away, that the officers had guns trained on him, that there was nothing that necessitated them tasering him other than their desire for expediency in gaining control over him. You're down to two minutes. Did you have a question, Judge Erickson? No, it's fine. If you want to reserve that balance for... I'll reserve the rest. Thank you. All right. Good morning, Your Honors.  And may it please the Court, Bob Dado from the Appellees. Good morning. I think I'd like to focus on questions from Judge Callahan and Judge Fernandez in terms of what the testimony is. Well, you're almost right to the jury, so why shouldn't the judge just let it go to the jury and let them determine whether what the officer's conduct was reasonable? Well, from a lawyer's perspective, you have to make that motion right then anyway, obviously. Right. I can't get in the mind of Judge Fairbank here, but I can say that her assessment of what the uncontradicted evidence was was correct and that any discrepancies in the testimony weren't material. Well, it seems that, obviously, if I read the record correctly, that the judge originally denied summary judgment based on this declaration by self. That's correct. And then it turns out that self said I never read what I signed. Right. So then self does say something that's a little bit different than what was in the declaration, and the judge does seem to indicate that self wasn't a credible witness or something along those lines? No. She certainly makes a statement about that's improper to sign a declaration under those circumstances. Because if you're making a credibility determination at that point, it just should have gone to the jury, right? Absolutely. And our contention is, no, it wasn't a credibility determination. It was more of a warning to, hey, you can't do that. So let's look at what self's testimony was, which basically is she can't see the arms, she can't see the hands, and she's a very long distance away. I mean, that's basically what her testimony is. The officer's testimony, you have three officers saying that Rodney lunged at them. The only discrepancy that I can see is Officer Salary. He's the guy with the taser. He doesn't say lunge. His testimony is that he's moving consistently forward towards them. Well, appellant's counsel seems to be alleging, and the last part of the argument was, that the tasing was excessive force. So why couldn't a jury find that the use of tasers after the first taser had just agitated Rodney, constitute the use of excessive force? So why shouldn't that have gone to the jury? The reason that shouldn't have gone to the jury, in our estimation, is that the use of tasering as a matter of law was reasonable, including repeated taserings, because the officers can't know when they go in there that this individual has an incredible tolerance for tasering. Okay, so basically it's undisputed about the tasering, how it occurred, right? Sure. So what is the law that you're relying on that says that tasing under those circumstances as a matter of law was not excessive force? Sure. And I would direct the court to our appellee's brief at page 11, citing the Draper case, and citing a name I'm going to botch that starts with a Z. Both of those cases involve situations which we believe are factually similar to these, where under the circumstances as a matter of law, those courts held, that would be the 11th Circuit in both of those cases, held that the use of tasering was reasonable as a matter of law. We have a couple of taser cases in front of me on bond court, don't we? I understand that, although I don't know the specifics. But those are the cases that we're relying on. And I'm sorry, the other case that we're relying on is the Russo case out of the 6th Circuit. That one involved repeated taserings. Again, reasonable as a matter of law. We submit under similar circumstances. Those are the authorities on which we are relying. Okay, then Rodney does ultimately get killed. Sadly, yes. On the undisputed facts here, why should that not have gone to the jury? The reason that that should not have gone to the jury is that there is no material dispute that he was advancing in some form on the officers at the time that they shot. What did that sister say? What she said was that I couldn't see his arms, I couldn't see his hands, I could only see this much. That's what she says, and she's some distance away. But as they point out, she also said he wasn't moving forward. They seem to say that. I don't read her testimony that way, but that seems to be what their contention is. The record would speak for itself. What if she did say that? What if she did say that? Yeah, he wasn't moving. If she says that he wasn't moving at the time, unless she's in a position where she can't possibly see it, so it's inherently incredible. And we don't know that to be true. I'm not sure we know that to be true. If she says that, then. If she said that, I don't read that testimony that way. If she did, then I guess there is a question. We had also raised, and I just wanted to touch on it briefly, because the reply brief did not respond to it. We had an alternate theory of affirmance based on qualified immunity, and I just wanted to briefly touch on that. Is that preserved for our purposes here? I believe it is in view of what the disposition of this case was below. I understand that she can't if you don't prevail at trial. I understand that. I think this is a significantly different situation where if a judgment is right on any theory, this court can affirm, and that was our point as to that. Well, what's your best case? I think Ortiz is a case that would go the other way. Correct? Oh, sorry. You caught me bad. Ortiz, the appellees. Let's see. The Ortiz v. Jordan, that there was a denial, I think, of a pretrial motion for qualified immunity, and it was immediately appealable. They didn't appeal, and so they said it didn't survive the trial. Right, right, right. And what I'm saying is that's a different – as I understand Ortiz, and correct me if I'm wrong, is that they go forward and they lose at trial. And our argument here is if this judgment, if this district court judgment is proper on any ground, you can affirm it on any ground. That, to me, is the distinction between this and Ortiz. And if I'm wrong on Ortiz, I apologize. Thank you. All right. What do we do about the tasering, though, their argument? I guess for the argument of provocation to work, they have to say the tasering was ultimately unconstitutional. That they were there shooting this guy with a taser and goading him when they knew that all they were doing was inflicting pain on him, but it didn't have any effect other than to outrage him. So they say, well, let's taser him again and see if we can outrage him more. And finally, like anything that's cornered and being hit with a stick, it finally comes at you and they say, aha, now we got you. Sure. So they would say that the tasering that went on for so long, knowing that it wasn't really effective, was a constitutional violation all by itself, ergo the shooting is.  I understand that argument. We will – I'm sorry. I didn't mean to interrupt you. You didn't really interrupt me because the only question is, well, is there conflicting evidence on that subject? No. And I would submit, no, there isn't conflicting evidence on that in terms of the situation that's presented to the officers at the time. Our contention is the first tasering is reasonable. The subsequent taserings are reasonable based on the circumstances presented to these officers at the time. And there's no evidence to the contrary. And there's no evidence to the contrary. That is precisely what our position is in terms of the circumstances confronting these officers. Well, what about the escalation that takes place during this entire – if you listen to the recording, there's a moment where Sergeant Thompson basically starts off. They say, take another step, you're dead. Then Sergeant Thompson says, go ahead, take a step. Another officer is heard to say, no, no, don't take the step, stay there. And then we get to the point where the decedent says, what do I got to do, charge you? Sure. I mean, isn't there a moment when you look at tasering, not tasering, that there's an escalation taking place and there's at least a fact question that's raised as to whether or not the decedent has been taunted into taking this step forward. And we would submit, no, that's not a question of fact, because that's true. They're trying different tactics here. There's no doubt about that. Different officers – Well, what kind of tactic says, I'm going to shoot you, go ahead, take a step? I mean, what kind of a – how is that diffusing the situation? I don't know. I wasn't there. Sure. But shouldn't the jury at least get to decide that question? And if not, why not? No, I don't believe the jury gets to decide that question. Well, I guess what I'm wondering is, does it matter why you take a step or why you come forward? If you have a knife and you advance, does that matter? I don't think it does, because the officer reasonably perceives that his life or the lives of his fellow officers are in danger. And that's the bottom line. Unless they unconstitutionally provoke themselves into danger, all of the case where the SWAT team goes in – Sure. If the police just wandered in with the inspector, it would be okay. But instead, a SWAT team comes charging in, and now they're really in danger because this guy who's cuckoo is going to start shooting at them. Sure. And I would agree with Your Honor if it's a case like that, and that we've hopefully distinguished in the briefs, where it's the officers that caused that whole thing to begin with. The officers didn't cause this initial situation. It's Rodney with a knife. It's threatening suicide. It's conflicting reports about assaults. Police officers have no control over that. They come into the situation, and they have to deal with it on a split-second basis. That's what distinguishes this case from those. Well, unfortunately, obviously, we never want things to end this way. I mean, there's a tragedy any time someone's life is lost, and particularly with people that are mentally unstable. So I guess the situation is, in hindsight, we can always – we hope that we would not do something the same if it didn't work. It's like a lawyer. If you try a case and you lose it, you're not going to try it exactly the same the next time. However, I'm wondering to what extent is that something that the officers' tactics should have gone to the jury in terms of determining is it provocation or was it just they were trying everything to save him, it didn't work, and it ended in a horrible tragedy. Right. That's what – but it was just ready to go to the jury, so should it have just gone to the jury and then – obviously, people appeal things anyway. But if it had gone to the jury, it would be very difficult to overturn their factual determinations as opposed to here it's a legal determination. Sure. As is obviously any other case where you've got a GMOL motion like this. Again, we just keep returning to our themes, which is what these officers did under these circumstances, and it didn't work. That's true. In hindsight, it didn't work. It certainly didn't come out the way the officers planned either. But that doesn't make what they did constitutionally unreasonable. You know, I think a lot of judges, when they're faced with a motion like this, which, of course, you had to make – Let it go. Sort of shrug and say, well, what the heck. Let it go to the jury. Sure. They can renew their motion. Sure. Put it in their back pocket, all of those sorts of things. Very straight shooter, and she looked at it honestly and did – this is what she thought, but it puts you where you are now. Absolutely, and certainly didn't take it lightly. I mean, no matter what this court does, this judge took her responsibility very seriously, looked at it and said, you know what? There's not a material factual issue here. We submit that was brawler. We don't appear to have any additional questions. You have a minute and a half. Then lucky me. I think I'll just sit down then. All right. Thank you. Thank you very much, Your Honor. I just wanted to reiterate a couple of quick points. These officers had no ability to choose any other training because they had either forgotten or were not aware of the domain training for dealing with mentally ill patients, and the Torrance Police Department provides no training. Actually, I don't think people care whether they're stabbed by someone mentally ill or whether they're stabbed by someone that's in perfect mental health. I mean, when someone is threatening your life, you don't ask yourself, and so I'm trying to figure out how you factor that in because it is always easy to reevaluate tragic situations with, you know, it's 20-20 clear in hindsight or from the barco lounger as opposed to when you're, you know, several feet from a person with a knife. The issue is if you don't know how to deal with mentally ill people, then you're going to get yourself into this situation and you're going to provoke a violent response. And I just wanted to read from the case that the defense cited, which is Russo, and in that case the court indicated that our review of the uncontested facts, however, leads us to conclude that at the time that Sizemore initially used the Taser, the initial use of the Taser, Bubbenhopper stood facing the officers a few feet within his apartment door with a knife in each hand. Sizemore knew that Bubbenhopper was potentially homicidal and suicidal. Our review of the uncontested facts, however, leads us to conclude that although plaintiffs' allegations may raise genuine issues of material facts as to whether the use of the Taser was reasonable, plaintiffs have failed to show they clearly established law at the time of the incident, declared such actions unconstitutional. So even in a very similar situation in Russo, the court concluded that there were still questions of fact as to whether the use of the Taser in that scenario, which is very similar to our case, was in fact contested issues that should have gone to the jury. Thank you. Unless any of the panel members have additional questions, your time has expired. There do not appear to be additional questions. Thank you. This matter will stand submitted. The last matter on calendar for argument today is Wang v. Bear Stearns.
judges: Erickson, Fernandez, Callahan